**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 5, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.    2021AP1006
                2021AP1620-CR**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2020TR5071
2021CT38

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE REFUSAL OF JOSHUA JOHN HANSEN:

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JOSHUA JOHN HANSEN,

    DEFENDANT-APPELLANT.

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JOSHUA JOHN HANSEN,

    DEFENDANT-RESPONDENT.

APPEALS from judgments of the circuit court for Dodge County: KRISTINE A. SNOW, Judge. *Affirmed*.

¶1 BLANCHARD, P.J.[1] Joshua Hansen appeals a judgment of conviction for operating a motor vehicle while intoxicated and operating a firearm while intoxicated. He challenges the circuit court's denial of his motion to suppress evidence obtained as a result of a traffic stop. Hansen argues that the officer who stopped him lacked reasonable suspicion to do so based solely on the fact that a blue light illuminated the rear license plate of the vehicle that Hansen was driving. I conclude that the State established reasonable suspicion based on the officer's observation of this light. Separately, Hansen argues that the officer unlawfully extended the stop by asking him whether he had been drinking, in violation of his Fourth Amendment rights. I conclude that the officer's questions about drinking did not unlawfully extend the stop because, by that time, the officer had reasonable suspicion of intoxicated operation. Accordingly, I affirm the judgment, the court's denial of the suppression motion, and the court's conclusion that Hansen's refusal to submit to a blood alcohol test was unreasonable.[2]

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(f) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Hansen relies on the same substantive grounds in challenging both the circuit court's denial of his suppression motion and its ruling that Hansen's refusal to submit to a blood sample was unreasonable. The circuit court held a combined evidentiary hearing to address both issues, and it ruled against Hansen on both based in part on the same Fourth Amendment analysis, which I affirm in discussion below. Hansen challenges the court's refusal decision based solely on the same arguments that he makes in challenging the suppression decision. For these reasons, I affirm the refusal decision based on the discussion in the text, but for ease of reference I refer only to the suppression motion and the related hearing.

**BACKGROUND**

¶2    At the hearing on Hansen's motion to suppress evidence, the State offered into evidence testimony by a Mayville police officer and a recording from a dashboard-mounted video camera in the officer's squad car. The circuit court credited all of the deputy's testimony.[3]  Hansen does not challenge any factual finding of the court related to the stop issue. Below I address, and reject, his challenge to one finding related to the extension-of-stop issue. The following background summarizes that testimony, as supplemented by details reflected in the dashboard camera recording.

¶3    On a Thursday in November 2020, a Mayville police officer was on patrol in his marked squad car in Mayville, Dodge County. At around 9:30 p.m., the officer observed a vehicle with a blue light illuminating its rear license plate. Based on his policing experience, the officer believed blue lights to be authorized only for use on law enforcement vehicles and he did not believe that the observed vehicle was a law enforcement vehicle. The officer began to follow the vehicle.

¶4    As reflected in the dash camera recording, the vehicle with the blue light turned at three consecutive intersections as the squad car followed it, at which point the officer activated his car's red and blue emergency lights.

---

[3] Explaining further, as pertinent to my discussion of the extension-of-stop issue below, the circuit court explicitly credited the officer's testimony regarding factors contributing to reasonable suspicion that Hansen was intoxicated (slurred speech, bloodshot, watery or glassy eyes, and inconsistent statements about where he was coming from and going to). However, the circuit court did not expressly credit the officer's specific testimony that the officer smelled an odor of intoxicants on Hansen's breath. Nevertheless, both parties on appeal treat as an established fact that, as the officer testified, he smelled an odor of intoxicants on Hansen's breath. Indeed, on appeal Hansen without criticism treats this as a finding made by the circuit court, and I understand the court to have implicitly made this finding. For these reasons, I consider the circuit court to have credited all of the officer's testimony.

Approximately thirty seconds later, the vehicle turned into a gas station and parked next to a gas pump.[4]  The officer parked behind the vehicle, got out of his squad car, and approached the vehicle on the driver's side.

¶5      The officer told the driver, later identified as Hansen, that the reason for the stop was that it is illegal in Wisconsin to operate a vehicle with a rear license plate illuminated by a blue light.  Hansen responded, "Is it?"  The officer asked for Hansen's driver's license.  While waiting for Hansen to produce his license, the officer asked where he was headed, to which Hansen responded "home."  After searching for about fifteen seconds, Hansen handed his license to the officer.  The officer clarified with Hansen where his current residence was, then asked for proof of car insurance, which Hansen indicated he would search for.

¶6      While Hansen searched for proof of insurance, the officer asked him where he was coming from.  Hansen said "um," and then paused.  The passenger responded that Hansen had picked the passenger up from home and they were going to a bar.  The officer asked the passenger where he lived and if he had any identification.  The passenger responded with an address but said that he did not have any identification with him.

¶7      Turning back to Hansen, the officer asked if he was lost, noting that he had just driven "around the few blocks a few times."  The passenger responded

---

[4] I omit from this summary additional references to aspects of Hansen's driving behavior before the stop, which the State relies on in partial support of its argument that the stop was not unlawfully extended.  This is because, as explained below, I conclude that the officer's observations of Hansen immediately following the stop were sufficient in themselves to establish reasonable suspicion to extend the stop long enough to inquire about drinking.

that he had been giving Hansen directions because Hansen was not from the area, but that the passenger had messed up the directions. Hansen said, "I'm not new— I am very new here." The officer asked the passenger for his name and date of birth, and the passenger provided a name and a date.

¶8     I pause to note that, at this point, the officer had spent approximately two minutes investigating the blue light illuminating the rear license plate (the original mission of the stop). This included making "'ordinary inquiries incident to the traffic stop,'" such as asking for a driver's license and proof of insurance and inquiring about where Hansen was coming from and going to. *See Rodriguez v. U.S.*, 575 U.S. 348, 355 (2015) (alteration removed; quoted source omitted); *see also State v. Betow*, 226 Wis. 2d 90, 93, 593 N.W.2d 499 (Ct. App. 1999) (once a vehicle is lawfully stopped for suspected traffic violation, "the driver may be asked questions reasonably related to the nature of the stop—including his or her destination and purpose").[5] The officer later testified that, during this two-minute period, he observed that Hansen's eyes were red, glassy, and bloodshot, that he could smell intoxicants on Hansen's breath, and that Hansen slurred some words.[6]

¶9     Returning to the chronology, the officer asked Hansen how much he had drunk that evening. It is this question that Hansen contends began the

_____

[5] Hansen does not argue that any of the questions that the officer posed to Hansen or the passenger were unrelated to the original mission of the stop until the officer asked about drinking. *See State v. Burgess*, No. 2021AP1067-CR, slip op., ¶¶30, 36 (Apr. 21, 2022) (not recommended for publication) (an officer's "passenger checks," including asking for passenger identification, were "'ordinary inquiries incident to [a traffic] stop'" (quoted sources omitted; alteration in original)).

[6] Implied in the circuit court's findings was that the officer observed indicia of Hansen having consumed alcohol, perhaps to the point of intoxication, before the officer asked whether Hansen had been drinking. Hansen does not argue that the officer noticed the indicia for the first time only after the officer asked about drinking.

unlawful extension of the stop. That is, Hansen argues that it is at this point that, even though the officer lacked reasonable suspicion to investigate a driving-while-intoxicated offense, the officer's mission changed from investigating the rear plate light to investigating suspected driving while intoxicated. Hansen responded that he had consumed "a few [drinks]" that evening. When the officer asked for clarification, Hansen said that he had consumed two drinks and two shots within the past hour at a bar.

¶10    Hansen eventually told the officer that he could not find proof of insurance, and the officer responded that he would return shortly. The officer headed back to his squad car with Hansen's driver's license.

¶11    After completing identification checks using the license, the officer conducted field sobriety tests of Hansen. After conducting these tests and administering a preliminary breath test, the officer arrested Hansen on a charge of operating a motor vehicle while under the influence.

¶12    In the circuit court, Hansen moved to suppress the evidence obtained as a result of the traffic stop and its allegedly unlawful extension. The court denied Hansen's suppression motion. Hansen pleaded no contest to one count of operating while intoxicated and one count of operating a firearm while intoxicated. The court entered a judgment against Hansen on these two counts and sentenced him. Hansen now appeals the court's denial of his suppression motion and the court's finding that his refusal to submit to a blood draw was unreasonable.

**DISCUSSION**

¶13    On appeal, Hansen argues that: (1) the officer merely observing the blue light illuminating Hansen's rear license plate did not constitute reasonable

6

suspicion justifying the traffic stop and (2) the officer lacked reasonable suspicion to ask Hansen whether he had been drinking, and therefore unlawfully extended the stop to inquire into that topic. After providing the pertinent standards of review, I address these arguments in turn.

¶14   This court reviews an order granting or denying a motion to suppress evidence as an issue "'of constitutional fact,'" which involves "'a two-step inquiry.'" *State v. Howes*, 2017 WI 18, ¶17, 373 Wis. 2d 468, 893 N.W.2d 812 (quoted source omitted). "First, [this court] will uphold the circuit court's findings of fact unless they are clearly erroneous," and "[a] finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *State v. Anderson*, 2019 WI 97, ¶20, 389 Wis. 2d 106, 935 N.W.2d 285. "Second, [this court] review[s] the application of constitutional principles to those facts independently of the decision[ ] rendered by the circuit court …." *See id.*

*Reasonable Suspicion For Stop*

¶15   Hansen argues that the circuit court erred in denying his motion to suppress on the ground that the blue light illuminating his rear plate was insufficient to establish reasonable suspicion for the stop. This is because, the argument proceeds, the officer failed to take steps, after seeing the blue light but before the stop, to rule out the possibility that the blue light did not fall within any of what Hansen contends are statutory exceptions to the general prohibition of blue lights on vehicles. I now provide pertinent legal standards and then explain my conclusion that the mere observation of the blue light on the rear plate of this vehicle provided reasonable suspicion for the stop.

¶16    "[S]hort investigative stops," sometimes called *Terry* stops,[7] are exceptions to the Fourth Amendment's protection against warrantless searches and seizures.  *See State v. Brown*, 2020 WI 63, ¶10, 392 Wis. 2d 454, 945 N.W.2d 584, *cert. denied*, 141 S.Ct. 881 (2020) (mem.).  These can include traffic stops of the type at issue here.  *See id.*  "While a traffic stop constitutes a seizure under the Fourth Amendment, it requires only reasonable suspicion of a legal violation."  *Id.* "Reasonable suspicion requires that '[t]he officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion of the stop.'"  *State v. Floyd*, 2017 WI 78, ¶20, 377 Wis. 2d 394, 898 N.W.2d 560 (alteration in original; quoted source omitted).    "The question of what constitutes reasonable suspicion is a commonsense test:  under all the facts and circumstances present, what would a reasonable police officer reasonably suspect in light of his or her training and experience[?]"  *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997).  "[T]he State bears the burden of proving that the seizure complied with the Fourth Amendment …."  *State v. Blatterman*, 2015 WI 46, ¶17, 362 Wis. 2d 138, 864 N.W.2d 26.

¶17    Applying these standards here, I conclude that the State established that the officer had reasonable suspicion to justify the traffic stop based solely on the officer's observation of the blue light on the rear plate of this vehicle, which could have constituted a traffic violation.  *See Brown*, 392 Wis. 2d 454, ¶10.  The officer observed what reasonably appeared to be a violation of Wisconsin's traffic

---

[7]  *See Terry v. Ohio*, 392 U.S. 1 (1968).

laws under WIS. STAT. § 347.13(3), which requires vehicles operating on Wisconsin highways to have *white* lights illuminating rear license plates.[8]

¶18    Hansen argues that a proper construction of pertinent statutes establishes that a blue light on the rear of a vehicle is not categorically prohibited on all vehicles operating on public roads.  I now summarize these statutes. Turning first to rules addressing illumination of the rear of a vehicle (without reference to the illumination of license plates), WIS. STAT. § 347.07(2)(b) prohibits the operation of vehicles on Wisconsin roads that have lights "on the rear" that are any color other than red, unless "otherwise expressly authorized or required" by ch. 347.  *See* § 347.07(2)(intro) ("Except … as otherwise expressly authorized or required by this chapter …..").  As referenced above, one example of when a non-red, rear-placed light is expressly required is contained in WIS. STAT. § 347.13(3): A vehicle must have a white light illuminating the rear license plate.  Thus, to this point, the result is familiar to anyone who drives Wisconsin roads:  a general rule requiring only red lights on the rear of vehicles and a more specific exception requiring lights, which must be white, on rear plates.

---

[8]  WISCONSIN STAT. § 347.13(3) states:

> No person shall operate on a highway during hours of darkness any motor vehicle upon the rear of which a registration plate is required to be displayed unless such motor vehicle is equipped with a lamp so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear.

"Highway," as used in WIS. STAT. § 347.13(3), means "all public ways and thoroughfares and bridges on the same" and "includes those roads or driveways in the state, county, … which have been opened to the use of the public for the purpose of vehicular travel …."  WIS. STAT. § 340.01(22); *see also* WIS. STAT. § 347.01.

9

¶19    Hansen notes that WIS. STAT. § 347.25(4) expressly authorizes vehicles used in police work to display blue lights generally, without specifying whether a blue light on a police vehicle can be located on the rear or elsewhere.[9]

¶20    With this as background, Hansen contends that, given the police-work exception in WIS. STAT. § 347.25(4), it was possible, from the perspective of the officer here, that Hansen's vehicle was an unmarked law enforcement vehicle, and therefore it could be legally operated with a blue colored light illuminating the rear plate.[10] For this reason, Hansen contends, the officer needed to rule out this purported possibility by looking up Hansen's vehicle's registration, or by having dispatch do so, before initiating the traffic stop. I now explain why Hansen's statutory argument fails based on statutory analysis and for additional reasons.

¶21    First, Hansen fails to come to grips with how, as noted above, the blue light on the rear plate here plainly violates WIS. STAT. § 347.13(3). That statute imposes an unqualified requirement that all vehicles operating in hours of darkness use white lights to illuminate their rear plates. *See* § 347.13(3). Unlike the general rule about red rear lights in WIS. STAT. § 347.07(2)(b), § 347.13(3) does not contemplate other statutes expressly authorizing non-white rear plate

---

[9] WISCONSIN STAT. § 347.25(4) states in pertinent part:

> No vehicle may be equipped with or display any blue colored light or lamp unless the vehicle is used in police work authorized by the state or a political subdivision of the state ….

[10] In order to address all arguments that Hansen may intend to make, I use the phrase "unmarked" as a reference to all police vehicles that do not bear the conventional rooftop flashing lights and distinctive coloring and emblems, including vehicles owned by police agencies that are used to catch traffic law violators and for undercover operations.

lights, and Hansen points to no source of authority that directly conflicts with § 347.13(3)'s requirement that the rear plate light be white.[11]

¶22   Second, even setting aside the fact that the officer could reasonably suspect that Hansen was in violation of WIS. STAT. § 347.13(3)'s unqualified rule requiring white rear plate lights, Hansen fails to address other relevant limitations on the authorization of blue lights for police vehicles in WIS. STAT. § 347.25(4). For example, § 347.25(1m)(a) specifies that "[a] police vehicle … may be equipped with a blue light and a red light which are *flashing, oscillating or rotating*." (Emphasis added.)   Section 347.25(1m)(b) further specifies that, for unmarked police vehicles, "the blue light shall be mounted on the passenger side of the vehicle."  Hansen does not assert (nor could he assert, based on the evidence credited by the circuit court) that the blue light on his vehicle was flashing, oscillating, or rotating, nor that it was on his vehicle's passenger side.  Thus, while § 347.25(4) authorizes blue lights on police vehicles under some circumstances, it would have been evident to a reasonable officer in the position of the officer here that the blue light he observed illuminating the rear plate did not comply with other requirements under § 347.25 for unmarked police vehicles.  Hansen does not argue that any other exception to the general prohibition of non-red rear lights found in WIS. STAT. § 347.07(2)(b) could have rendered the blue light here to be lawful.  In sum, there were no pertinent statutory exceptions for the officer to rule out prior to stopping Hansen.

---

[11] Hansen briefly acknowledges the existence of WIS. STAT. § 347.13(3), but he fails to address its application here.  He references the statute apparently to merely make the broad point that, as contemplated in WIS. STAT. § 347.07(2)(b), other provisions in ch. 347 expressly authorize or require non-red rear-placed lights on vehicles in some situations.  This broad point is true, but it goes nowhere for Hansen for the reasons explained in the text.

¶23 Moreover, even if the statutes summarized above could be interpreted to authorize blue rear plate lights for police vehicles, Hansen's argument that the officer had to rule out such possibilities rests on an inaccurate application of basic Fourth Amendment principles and a misreading of a one-judge opinion of our court, *State v. Palaia*, No. 2016AP467-CR, unpublished slip op. (WI App Dec. 30, 2016), which he cites as persuasive authority. Hansen specifically asserts that the reasoning in *Palaia* required the officer here to exclude the possibility that Hansen's vehicle was an unmarked police vehicle because WIS. STAT. § 347.25(4) generally permits police vehicles to display blue lights. I disagree that *Palaia* supports any argument that Hansen makes.

¶24 In *Palaia*, an officer obtained data on a vehicle with Wisconsin plates that the officer was following. *Palaia*, No. 2016AP467-CR, ¶2. The officer stopped the vehicle, with the only justification asserted by the State being that the officer learned that one of the vehicle's two registered owners did not have a Wisconsin driver's license. *Id.*, ¶¶2-3, 9. The problem with this justification, this court explained, is that the officer had "no reasonable basis … to suspect [that] the person operating the vehicle was doing so illegally" because "driving a Wisconsin[-]registered vehicle without a Wisconsin-issued driver's license is not a criminal or traffic offense." *Id.*, ¶9. Moreover, the inference that the driver in *Palaia* was violating an administrative requirement—specifically that new Wisconsin residents obtain a Wisconsin driver's license within 60 days of establishing residency—was nothing more than an "'inchoate and unparticularized suspicion, or hunch'" based on the officer's limited information about the driver. S*ee id.*, ¶¶8, 11-12. These points *entirely* eliminated the only asserted basis to suspect that the driver was committing a criminal or traffic offense. *See id.*, ¶¶9, 14.

12

¶25 Contrary to Hansen's argument, *Palaia* does not require officers who rely on a purported violation of a statute as a basis for a traffic stop to exclude all possible statutory exceptions prior to the stop. Rather, *Palaia* simply states that there could be no reasonable suspicion for a stop when an officer has not obtained *any* facts that would lead a reasonable officer in the same position to believe that a driver is violating a criminal or traffic law. *See id.*, ¶9. Further, although the officer in *Palaia* did not observe facts sufficient to establish reasonable suspicion justifying the stop, it remains true that "behavior that has a possible innocent explanation" can still "give rise to reasonable suspicion." *See State v. Hogan*, 2015 WI 76, ¶36, 364 Wis. 2d 167, 868 N.W.2d 124; *see also Palaia*, No. 2016AP467-CR, ¶9.

¶26 In contrast to *Palaia*, here the officer observed a traffic violation, for reasons explained above. *Cf. Palaia*, No. 2016AP467-CR, ¶9. The officer here was not required to rule out merely possible innocent explanations for the light before stopping Hansen, even if Hansen's interpretation of the pertinent statutes were correct. *See Hogan*, 364 Wis. 2d 167, ¶36; *Palaia*, No. 2016AP467-CR, ¶9; *Brown*, 392 Wis. 2d 454, ¶10.

¶27 Further, as the State points out, the officer here could rely on the commonsense notion that, even if an unmarked police car could legally display a blue light on its rear plate, it would be unreasonable to expect that an unmarked police vehicle would effectively announce its police status with a blue light on the plate. That is, in non-emergency situations, police would not make it so obvious that the vehicle is a police vehicle or, at a minimum, police would not want the vehicle to be especially noticeable—as any vehicle with a blue light on its plate would tend to be. At bottom, it is reasonable for an officer to conclude that a blue rear plate light is much more likely to be a civilian vehicle violating the statutes

13

summarized above. Thus, an officer's dismissal of the possibility that an observed blue light on a rear plate is on a police vehicle, without taking steps to confirm non-police status, is not nearly so speculative or "tenuous" as the assumptions at issue in *Palaia* regarding the nature of the driver's residency. *See Palaia*, No. 2016AP467-CR, ¶12 (noting that people are highly mobile in modern society, and therefore the place of registration for a given vehicle has little significance in providing reasonable suspicion of a violation of a licensing requirement). In sum, the officer here did not need to rule out possible statutory exceptions to blue lights on the rear of vehicles, and nothing more than reasonable suspicion of a criminal or traffic violation is required to conduct a traffic stop. *See Hogan*, 364 Wis. 2d 167, ¶36; *Palaia*, No. 2016AP467-CR, ¶9; *Brown*, 392 Wis. 2d 454, ¶10.

¶28    In addition, beyond these commonsense points, there is the issue of whether the officer here could reasonably assess whether Hansen's vehicle was in fact not likely a police vehicle. I question Hansen's suggestion that an officer with the experience of the officer here could not reasonably rely on that experience to discern whether an observed vehicle is a police vehicle, even if it lacks the conventional rooftop flashing lights and distinctive coloring and emblems. Hansen emphasizes that the officer here testified that, given that there are many police agencies in Wisconsin, each of which could in theory use unmarked vehicles, the officer "would not be able to conclusively determine from plain view alone" whether Hansen's car was an unmarked police vehicle. But in Fourth Amendment analysis, officers may act reasonably without the benefit of "conclusive" determinations of fact. Moreover, Hansen fails to explain why the circuit court here could not credit and place weight on the officer's additional testimony that he had never seen a police vehicle with a blue light on the rear plate and that Hansen's vehicle did not appear to the officer to be an unmarked police

14

vehicle, particularly given WIS. STAT. § 347.25(1m)(b)'s specifications regarding the nature of blue lights on police vehicles.[12]

*Extension Of Stop*

¶29     Hansen argues that the circuit court erred in denying his motion to suppress evidence obtained as a result of the officer's extension of the stop to investigate whether Hansen was driving while intoxicated.  Specifically, Hansen argues that asking about drinking extended the stop in violation of his Fourth Amendment rights because the officer lacked reasonable suspicion justifying the extension.  I conclude that the officer's question did not unlawfully extend the stop because reasonable suspicion of driving while intoxication was objectively established, during the brief interaction before the officer questioned Hansen about drinking, as part of the original mission of the stop.  As explained below, I reject Hansen's three arguments:  that the court clearly erred in finding that he slurred some of his words; that evidence of bloodshot eyes could add nothing to the analysis; and that the lack of evidence of "bad driving" fatally undermines a reasonable suspicion determination.

---

[12] Hansen makes an additional reference that does not advance his stop argument.  He argues that the relative ease with which the officer could have sought additional information about Hansen's vehicle to dispel the possibility that he was operating a police vehicle before initiating the traffic stop is significant to determining whether it was reasonable to initiate the stop without further investigation.  In support, he cites ***State v. Guzy***, 139 Wis. 2d 663, 407 N.W.2d 548 (1987), in which our supreme court explained that circumstances surrounding a police seizure challenged under the Fourth Amendment influence whether a given quantum of facts gives rise to reasonable suspicion, including consideration of investigative means that police could have used in lieu of the seizure or whether failing to initiate the seizure would have risked losing the opportunity to conduct further investigation.  *See* ***id.*** at 678-82.  But, for reasons explained above, this is not a case involving "scant" evidence of a law violation of the type referenced in ***Guzy***, 139 Wis. 2d at 678—the blue light on the plate was a facial law violation.

¶30     The "permissible duration" of a traffic stop "depends on the stop's 'mission' which includes '(1) addressing the traffic violation that warranted the stop; (2) conducting ordinary inquiries incident to the stop; and (3) taking negligibly burdensome precautions to ensure officer safety.'" *Brown*, 392 Wis. 2d 454, ¶16 (quoted source omitted).   "The ordinary inquiries portion of the traffic stop's mission includes 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *State v. Smith*, 2018 WI 2, ¶10, 379 Wis. 2d 86, 905 N.W.2d 353 (citing *Rodriguez*, 575 U.S. at 355).

¶31     The length of a stop becomes unreasonable if extended past the point "'when tasks tied to the traffic infraction are—or reasonably should have been—completed.'"   *Brown*, 392 Wis. 2d 454, ¶10 (quoted source omitted).   "Officers may engage in unrelated inquiries during the course of a traffic stop—but, unless reasonable suspicion develops to support such inquiries, they cannot prolong the duration of the stop beyond the time that it reasonably should take to complete the [original] mission."   *State v. Davis*, 2021 WI App 65, ¶24, 399 Wis. 2d 354, 965 N.W.2d 84.

¶32     To recap, the officer's original mission in stopping Hansen was to investigate the blue light on the plate.   During the roughly two minutes the officer spent conducting ordinary inquiries incident to the original mission of the stop, the officer observed that Hansen had bloodshot, glassy eyes, slurred speech, and the odor of intoxicants on his breath.   I conclude that these observations constituted specific and articulable facts that lead to the reasonable inference that Hansen was violating the law by operating a motor vehicle while intoxicated.   *See Floyd*, 377 Wis. 2d 394, ¶20.   This permitted the officer to lawfully extend the stop by asking

questions, separate from the original mission of the stop, about recent alcohol consumption. *See Davis*, 399 Wis. 2d 354, ¶24.

¶33 Hansen argues that the circuit court clearly erred in crediting the testimony of the officer that Hansen slurred some words and that this finding should be excluded from the reasonable suspicion analysis. Specifically, Hansen argues that the court erred in making this finding because the officer could not recall which specific words Hansen slurred and, Hansen now submits, he cannot be heard slurring words on the dash camera video prior to the officer asking him the first question about drinking. As noted, under the clearly erroneous standard, this court affirms a circuit court's findings of fact unless "it is against the great weight and clear preponderance of the evidence." *See Anderson*, 389 Wis. 2d 106, ¶20. Although the officer could not recall while testifying precisely which words Hansen slurred, the circuit court credited the officer's testimony that Hansen slurred his speech, and my review of the dash cam footage does not clearly contradict this finding. For these reasons, I reject Hansen's argument that the court's slurred-speech finding is clearly erroneous when evaluated against the great weight and clear preponderance of the evidence. *See id.*

¶34 Having established that the slurred-speech finding was not a clear error, that finding becomes part of the totality of the circumstances under which each relevant finding is assessed. *Floyd*, 377 Wis. 2d 394, ¶22 (This court "draw[s] the line between traffic stops of proper duration and those that extend into unconstitutional territory according to functional considerations" "in the context of the 'totality of the circumstances.'" (quoted source omitted)). Hansen does not argue that the court clearly erred in making the findings of bloodshot eyes and the smell of intoxicants on Hansen's breath.

¶35 Hansen argues that the circuit court's finding that his eyes were bloodshot, even when coupled with the odor of intoxicants, was insufficient to establish reasonable suspicion, in part because bloodshot eyes can have many potential causes. But even if each individual indicia of intoxication here could have had an innocent explanation, such possible explanations do not detract from the reasonableness of the possibility that drinking was the cause, and this possibility was greatly reinforced by the combination of different indicia. *See Hogan*, 364 Wis. 2d 167, ¶36. Further, Hansen's argument about bloodshot eyes is based in part on the argument I reject above that Hansen was not slurring some of his words.[13]

¶36 Considering the totality of the circumstances, the officer observed specific and articulable facts (slurred speech, bloodshot, glassy eyes, and odor of intoxicants on breath) which, when evaluated together with rational inferences drawn from those facts, established reasonable suspicion of intoxication. *See Floyd*, 377 Wis. 2d 394, ¶¶20, 22. For these reasons, the officer did not violate Hansen's Fourth Amendment rights by extending the stop to inquire about

---

[13] As part of his argument about bloodshot eyes, Hansen makes a confusing reference to this court's decision in *State v. Kolman*, No. 2011AP1917-CR, unpublished slip op. (WI App Jan. 12, 2012), and I reject whatever he intends to argue based on *Kolman* for at least the reason that its facts are distinguishable. In *Kolman*, this court applied the legal standards that existed at that time to determine whether it was reasonable for an officer to change the mission of a traffic stop from an investigation of a potential brake light violation to an investigation of potential impaired driving. *See id.*, ¶¶3-5, 21-22. This court reasoned that the officer's decision to extend the stop was permissible under the Fourth Amendment even though "the facts possessed by the trooper at the time of [the stop's extension] may have fallen short of reasonable suspicion of intoxicated driving." *See id.*, ¶¶22, 25. These facts included that the driver had "bloodshot and glassy eyes," along with the "overwhelming odor of cigarette smoke coming from the vehicle," which the officer testified is a not uncommon way to intentionally mask the smell of intoxicants. *Id.*, ¶¶3-4. The facts here are different from the facts in *Kolman* that "may" not have been sufficient. It is uncontested that the officer here *did* smell intoxicants, in addition to seeing bloodshot eyes, *without* the presence of cigarette smoke, *and* with the presence of some slurring of words.

Hansen's drinking. Hansen provides no alternative basis for me to conclude that the officer made inquiries unrelated to the original mission or unsupported by reasonable suspicion that measurably and unlawfully extended the stop. *See Brown*, 392 Wis. 2d 454, ¶16.

¶37 Hansen further argues that, because the officer here did not observe driving behavior that was indicative of impairment, "other factors suggesting impairment must be more substantial" to justify extending the stop to investigate impaired driving. *See County of Sauk v. Leon*, No. 2010AP1593, unpublished slip op., ¶20, (WI App Nov. 24, 2020) ("When an officer is not aware of bad driving, then other factors suggesting impairment must be more substantial."). As noted above, I assume without deciding in Hansen's favor that none of Hansen's driving behavior contributed to reasonable suspicion justifying an extension of the stop—in my analysis Hansen has the benefit of driving that did not suggest impairment. *See* note 4, *supra*. However, *Leon* does not impose a heightened standard for justifying a stop extension to investigate possible impairment when the officer has not observed driving that suggests impairment. Rather, it states that police must have reasonable suspicion to extend a stop, whether that suspicion is based wholly or partially on the observation of impairment-suggestive driving behavior or entirely on other indicia of driver impairment. *See Leon*, No. 2010AP1593, ¶20. As explained above, the officer here did observe other signs during the investigation of the original mission of the stop that I conclude established reasonable suspicion justifying a brief extension of the stop, even when I do not consider Hansen's driving behavior.

## CONCLUSION

¶38 For all of these reasons, I affirm the judgment and the circuit court's denial of Hansen's suppression motion.

*By the Court*.—Judgments affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.